UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANK NASON,<br><br>Defendant. | Case No. 95-cr-00319-SI-1; 3:15-cv-03545 SI<br><br>**ORDER DENYING AMENDED MOTION TO VACATE UNDER 28 U.S.C. § 2255**<br><br>Re: Dkt. No. 1917 |

Now before the Court is petitioner Frank Nason's amended motion to vacate his judgment and sentence pursuant to 28 U.S.C. § 2255. For the reasons set forth below, the Court DENIES the motion and DENIES a certificate of appealability.

## BACKGROUND

**I.   The underlying criminal case**

On September 13, 1995, an indictment was returned in the Northern District of California charging Walter Pierre Rausini and nine other individuals with drug offenses, including conspiracy to distribute cocaine and methamphetamine. Dkt. No. 9. Frank Nason was not charged until the government filed a second superseding indictment on October 2, 1997. That indictment alleged, *inter alia*, that Rausini arranged the murders of two co-conspirators, Lance Estes and John Ellenberger, because he was concerned that they might become informants for law enforcement. Dkt. No. 326. On February 5, 1998, the government filed a third superseding

1    indictment charging Rausini, Nason, and co-defendant Wayne Harrison with, *inter alia*, two
2    counts for violations of 21 U.S.C. § 848(e)(1)(A) (Killing While Engaged in a Narcotics
3    Conspiracy), and two counts for violations of 18 U.S.C. § 1512(a)(1)(C) and (2) (Tampering with
4    an Informant), for the murders of Estes and Ellenberger. Dkt. No. 403. At issue in these
5    proceedings is Nason's guilty plea to the Ellenberger murder; Nason does not challenge his
6    conviction for being an accessory after the fact to Estes' murder.

7    On January 27, 2000, Rausini pled guilty to two counts of solicitation to commit murder in
8    violation of 18 U.S.C. § 373. Rausini's plea agreement stated that he "solicited that Ellenberger
9    be killed. At my direction, in mid-May, 1995, Nason killed Ellenberger." Dkt. No. 852 at 3.
10   Pursuant to his plea agreement, on May 19, 2000, the Court imposed a 40 year sentence on
11   Rausini. Dkt. No. 879. In his allocution, Rausini also admitted the essential elements of all these
12   crimes. Rausini's plea agreement did not require him to cooperate with the government with
13   regard to his co-defendants.

14   Nason was a fugitive until February 1, 2000, when he made his first appearance in this
15   district. Dkt. No. 853. According to court minutes filed on July 26, 2000, a status hearing was
16   held on July 25, 2000 with regard to Nason and Harrison. Dkt. No 905. Those minutes state that
17   the parties were no longer discussing the possibility of entering into a plea agreement and were
18   preparing for trial. Trial was set for February 5, 2001. Dkt. No. 884.

19   On October 11, 25 and 26, 2000, then-United States Attorney Robert Mueller, who was
20   overseeing the criminal case, and FBI Special Agent Bruce Burroughs met with Rausini at the
21   federal penitentiary in Leavenworth, Kansas. Agent Burroughs prepared an FBI 302 report of the
22   information provided by Rausini during those interviews. Dkt. No. 1924-11. The report contains
23   a section titled "<u>ELLENBERGER HOMICIDE - May 18, 1995</u>." *Id*. at 20.[1] According to Agent
24   Burroughs' report, in May 1995, Rausini had a conversation with Ellenberger and another
25   individual named Mark Farchione about "setting up" various other drug traffickers for arrest. *Id.*
26   at 20-21. Subsequently, Ellenberger "talked to Nason about the discussions they had with Mark

---

[1] The Court cites the original pagination of the report and not either of the two sets of bates-stamped numbers.

United States District Court
Northern District of California

[Farchione] and Nason's response was that he was totally against setting up his friends . . . . Rausini stated that Nason started talking to him about killing Ellenberger." *Id*. at 21.

According to Burroughs' 302 report, on May 18, 1995, Rausini went to a nightclub in Costa Mesa, California. Nason arrived at the same club around midnight. The report states,

> Rausini commented that he had been drinking heavily, but recalled that Nason told him on arriving at the club that he was going to kill Ellenberger. . . . He recalled that in discussion with Nason that evening, Nason told him that he needed an alibi. Rausini further stated that he acquiesced and told Nason that he would vouch for being with him that evening.

*Id*. at 22. According to the report, Rausini stated that Nason left the club and took a cab to Marina Del Rey, where Nason and Ellenberger were staying together in an apartment. Rausini stated that later that same evening, Rausini went to the Marina Del Rey apartment and Ellenberger was still alive. Rausini returned to the apartment the following morning. When he arrived he "found Ellenberger laying face down on the floor . . . he knew that he was dead." *Id*. In a conversation later that day, "Nason told him [Rausini] that he 'choked' Ellenberger out while Ellenberger was asleep and also hit him with a tool." *Id*. at 23. The report also contains information provided by Rausini regarding how Rausini, Nason, and other individuals disposed of Ellenberger's vehicle and body[2] and cleaned up the murder scene. *Id*. at 23-26. The report does not state that Rausini directed Nason to kill Ellenberger.

In a letter dated November 8, 2000, Mueller memorialized an agreement between Rausini and the government. Rausini agreed to assist the government and "testify truthfully and completely before any Grand Jury and at any hearing or trial." Dkt. No. 1808-2. In exchange for that assistance and testimony, the government "agree[d] to file a motion under Rule 35 of the Federal Rules of Criminal Procedure setting forth the extent and significance of [Rausini's] cooperation." *Id*.[3]

---

[2] According to Rausini, co-defendant Wayne Harrison, Rausini and two other individuals wrapped Ellenberger's body in a comforter or a sleeping bag, and they put his body in a dumpster, while Nason disposed of Ellenberger's car. *Id*. at 25. Ellenberger's body was never found.

[3] The November 8, 2000 agreement also stated that the government would not recommend any specific reduction in Rausini's sentence, and that "the amount of reduction in your sentence, if any, will be left to the discretion of Judge Susan Illston." *Id*.
The government did not file a Rule 35 motion until 2006, after this Court granted Rausini's

3

1    On November 13, 2000, Nason's attorney, Stuart Hanlon, wrote a letter to Assistant United
2    States Attorney Sharon Bunzel memorializing a conversation that Hanlon and Bunzel had on
3    November 9, 2000. Dkt. No. 1803, Ex. 21. That letter states, *inter alia*, "you have informed me
4    that Mr. Rausini is now a federal witness." On December 8, 2000, Mueller and Hanlon filed a
5    Joint Request for Voluntary Settlement Conference before then-Chief Judge Patel of this District.
6    Dkt. No. 965. On December 12, 2000, the government sent Hanlon a copy of the FBI 302 report
7    of the interviews of Rausini conducted on October 11 and 25-26, 2000. In a letter to Hanlon dated
8    December 12, 2000, Mueller also stated that he was enclosing a "draft of a settlement conference
9    statement in the form of a letter to Judge Patel." Dkt. No. 1924-12. Mueller's letter to Judge Patel
10   stated, *inter alia*, that Rausini "has recently been interviewed [and] has indicated a willingness to
11   testify against Nason and Harrison." *Id*.

12   The settlement conference was held on December 14, 2000.[4] On December 15, 2000, the
13   Court set a change of plea hearing for Nason for December 21, 2000. Dkt. No. 970.

14   On December 21, 2000, Nason pleaded guilty to a superseding information charging him
15   with conspiracy to manufacture methamphetamine and to distribute methamphetamine and
16   cocaine, in violation of 21 U.S.C. § 846 (Count One); committing a murder in furtherance of a
17   continuing criminal enterprise, in violation of 21 U.S.C. § 848(e)(1)(A) (Count Two); and

---

request to compel the United States to file such a motion. Dkt. Nos. 1412, 1413. The Rule 35 litigation has been protracted. In an order filed July 12, 2006, this Court granted the Rule 35 motion and reduced Rausini's sentence by two years, for a total of 38 years. Rausini appealed, and on June 24, 2008 the Ninth Circuit held that the government had violated the November 8, 2000 agreement by making a specific sentencing recommendation to this Court (the government had recommended a one-year sentence reduction). The Ninth Circuit vacated the sentence and remanded for resentencing before a different judge. On remand, the matter was assigned to Judge Patel, who held a series of evidentiary hearings in 2011. On November 9, 2011, Judge Patel reduced Rausini's sentence to 35 years, and Rausini appealed. On April 26, 2013, the Ninth Circuit vacated and remanded, finding that the government had again violated the November 8, 2000 agreement by filing a letter it had received that was addressed to Judge Patel from someone purporting to be a friend of one of the murder victims. On remand, the matter was assigned to Judge Chesney. On March 17, 2014, Judge Chesney resentenced Rausini to a total sentence of 34 years. Rausini appealed, and that appeal is currently pending before the Ninth Circuit.

[4] Nason's amended motion asserts that at that settlement conference, Mueller stated that Rausini was prepared to testify at Nason's trial that he directed Nason to kill Ellenberger and that Nason did so. Dkt. No. 1917 at 15. The government notes that Nason does not provide any evidence in support of this assertion, as there is no transcript of the settlement conference.

United States District Court
Northern District of California

1   accessory after the fact to a murder, in violation of 18 U.S.C. § 3 (Count Five).[5] In the plea
2   agreement, Nason swore that he "killed [John] Ellenberger at the request and direction of [Walter]
3   Rausini"; that he was present when a codefendant, Wayne Harrison, shot Lance Estes in the head;
4   that he helped "clean up the scene" of Estes's murder; and that he "assisted Rausini in
5   manufacturing and distributing crystal methamphetamine and cocaine on numerous occasions."
6   Dkt. No. 978.  In his allocution, Nason also admitted the essential elements of all these crimes.
7   This Court entered judgment on June 6, 2001, and sentenced Nason pursuant to the terms of the
8   plea agreement to 300 months imprisonment.  Dkt. Nos. 1033, 1036.

Nason did not appeal, and he is currently an inmate at the federal prison in Atlanta, Georgia.

## II.  Nason's First 28 U.S.C § 2255 motion

On June 28, 2004, Nason filed his first motion to vacate and set aside his sentence pursuant to 28 U.S.C. § 2255.  Dkt. No. 1313.  In that motion, Nason contended that Hanlon provided ineffective assistance of counsel by misrepresenting the government's evidence against him and urging him to accept the plea bargain.  Nason claimed that prior to entering his plea, he and Hanlon met in December 2000, and that Hanlon told him that Rausini was planning to testify that Rausini had solicited Nason to kill Ellenberger.  Nason alleged that although he wanted to plead not guilty, Hanlon urged him to plead guilty because Hanlon believed Rausini's testimony would destroy Nason's defense, which was that he killed Ellenberger in a fight and not at Rausini's direction.  Nason stated that during that December 2000 meeting, Hanlon showed Nason the FBI 302 report of the interviews with Rausini on October 11 and 25-26, 2000, and that Nason gave a cursory review of the report and gave it back to Hanlon.  Dkt. No. 1331 at 3.

Nason claimed that his motion was timely because he did not discover the facts supporting his claim until June 2004.  Nason claimed that in June 2004, he learned from another inmate that

---

[5] The superseding information to which Nason pled guilty was filed on December 21, 2000.  Dkt. No. 976.

5

Rausini was filing a motion in which he was claiming that he never solicited Ellenberger's murder. Dkt. No. 1331 at 5.[6] Nason claimed that after he learned this, he requested his complete file from Hanlon. Nason received the files in August and September of 2004, and in those files Nason discovered the FBI 302 report and two other documents that allegedly supported his claim (the December 8, 2000 Joint Request for Voluntary Settlement Conference and the Settlement Conference Statement). Nason claimed that the FBI 302 report supported his ineffective assistance claim because that report did not contain any statements by Rausini that he solicited Nason to kill Ellenberger or that Rausini was intending to testify to this fact at trial. Nason argued that the FBI 302 report contradicted Hanlon's statements about Rausini's intended testimony and revealed that Hanlon misrepresented the facts to Nason.

On August 22, 2005, this Court denied the section 2255 motion on the ground that it was untimely. Dkt. No. 1366. The Court found that Nason was required to file his section 2255 motion on or before June 16, 2002, in order to meet the one-year statute of limitations. The Court rejected Nason's argument that the statute of limitations should be tolled because of "extraordinary circumstances" because Nason did not learn of his claims until June 2004. The Court held that Nason could have read the FBI 302 report during his December 2000 meeting with Hanlon, noting that "Rausini's statements relating to the Ellenberger homicide were clearly marked off in the report with an all-capitalized and underlined subheading of '<u>ELLENBERGER HOMICIDE - May 18, 1995</u>,'" and that this section was less than seven pages long. *Id*. at 7. The Court further held that even if Nason had been unable to read the report at that meeting, he did not then exercise due diligence to obtain the report. The Court concluded, "Nason has not demonstrated that extraordinary circumstances prevented him from reading the report at the December 2000 meeting or from subsequently obtaining the FBI report, and fails to meet the 'very high threshold' required for tolling." *Id*.

The Court also found that neither the Joint Request for Voluntary Settlement Conference

---

[6] The docket reflects that after his conviction, Rausini proceeded to file numerous letters and motions with the Court, including motions under 28 U.S.C. § 2255, as well as filings related to the Rule 35 proceedings.

nor the Settlement Conference Statement made any specific reference to Rausini or Rausini's testimony, and thus neither document supported Nason's claim of ineffective assistance.[7] Therefore, Nason's alleged inability to obtain these documents until 2004 did not support equitable tolling of the statute of limitations. Finally, Nason claimed that Judge Patel had made allegedly coercive statements to him at the December 2000 settlement conference, and that Hanlon did not object to the statements. The Court found that these alleged facts did not support equitable tolling because "Nason was present at the settlement conference where the alleged coercion occurred and, . . . was able to consult his own memory of Judge Patel's statements in order to file a timely § 2255 motion." *Id*. at 8. This Court and the Ninth Circuit denied Nason's requests for a certificate of appealability. Dkt. Nos. 1395, 1429.

### III. Nason's subsequent filings

After the denial of his initial section 2255 motion, Nason continued to file numerous motions in this case. On November 2, 2006, Nason filed a "motion for disclosure of exculpatory evidence and for leave to supplement motion for relief from judgment." Dkt. No. 1474. On November 16, 2006, Nason filed a motion under Federal Rule of Civil Procedure 60(b) seeking to set aside the Court's August 22, 2005 order on the ground that "newly discovered evidence" showed that the 2004 section 2255 motion was timely. Dkt. No. 1480. Specifically, Nason relied on the government's Rule 35 motion filed in Rausini's case on March 9, 2006, in which the government stated that Rausini denied ordering Ellenberger's murder and that the murder was Nason's idea. *See* Dkt. No. 1413.

On November 29, 2006, this Court denied the Rule 60(b) motion. Dkt. No. 1484. The Court held that the Rule 35 motion "does not contain any new information" or "exonerate [Nason]

---

[7] Nason argued that the Joint Request for Voluntary Settlement Conference supported his ineffective assistance claim because that request referenced Criminal Local Rule 11-1, and he discovered alleged violations of that rule (including that defendants need not be present at settlement conferences and Nason attended the conference). Nason argued that the settlement conference statement supported his claim because that document stated that one of the weaknesses of the government's case was that most of its witnesses against Nason had pled guilty and were receiving some kind of deal and/or benefit for their testimony.

in any way." *Id.* at 2. The Court noted that when Nason filed his section 2255 motion in June 2004, he "was aware that Rausini would be filing a motion claiming that Rausini did not solicit Ellenberger's murder" and "[t]hus, this information contained in the Rule 35 motion is not new, and does not alter the Court's conclusion that petitioner's § 2255 motion was untimely." *Id*. The Court also noted that Nason's Rule 60(b) motion "raises a number of other contentions . . . that are actually challenges to his plea and sentence" and that "many of these contentions were advanced in the original § 2255 motion." *Id*. The Court held that "[t]o the extent that [Nason] wishes to raise these contentions, [he] must seek permission from the Ninth Circuit Court of Appeals to file a second or successive § 2255 motion." *Id*.

On April 12, 2007, the Court denied Nason a certificate of appealability on his claim that the Court had erred in denying his Rule 60(b) motion. Dkt. No. 1577. Nason appealed the order denying his Rule 60(b) motion, Dkt. No. 1541, and on December 4, 2007, the Ninth Circuit denied a certificate of appealability. Ninth Circuit Case No. 07-16158, Dkt. No. 21. Nason petitioned for certiorari, and the Supreme Court denied review. *Nason v. United States*, 552 U.S. 1270 (2008).

On December 1, 2006, Nason filed a "correction" to the Rule 60(b) motion, and on December 4, 2006, he filed a motion for leave to supplement the motion for relief from judgment. Dkt. Nos. 1490, 1491. On December 6, 2006, this Court denied the motions, noting that "[t]hese filings largely reiterate the contentions made in [Nason's] Rule 60(b) motion." Dkt. No. 1492.

On December 7, 2006, Nason filed a motion to disqualify the undersigned judge. Dkt. No. 1496. That matter was referred to Judge Breyer, who denied the motion on January 12, 2007. Dkt. No. 1512.

On January 18, 2007, Nason filed a motion to vacate the orders denying the Rule 60(b) motion. Dkt. No. 1514. On February 5, 2007, this Court denied the motion. Dkt. No. 1547. In that order, the Court noted that Nason had filed "numerous documents" since the motion to disqualify the Court, and the order stated, "Petitioner is instructed not to file any further documents in this action. The Court shall not accept any further filings." *Id*. at 1.

On April 4, 2008, Nason filed a motion for discovery. Dkt. No. 1656. On January 5, 2009, Nason filed a second motion under section 2255 and to dismiss the indictment for

8

outrageous government misconduct. Dkt. No. 1684. The second 2255 motion claimed that Nason and Rausini had been framed for the Estes and Ellenberger murders by corrupt law enforcement agents.[8] On January 9, 2009, Nason filed another motion for relief from the Court's order denying his section 2255 motion. Dkt. No. 1688.

On February 11, 2009, this Court filed an order denying Nason's pending motions without prejudice. Dkt. No. 1690. The order noted that the Court had "instructed petitioner not to file any further documents in this closed case" and that Nason had "continued to file motions and other documents." The order stated that Nason's "filings relate, in part, to matters involving" Rausini, and that Rausini's Rule 35 proceedings were pending after remand. Because of these proceedings, "the Court finds it prudent to accept the documents filed by [Nason] since February 5, 2007," and stayed "all further proceedings pending resolution of Mr. Rausini's case." The order directed Nason "not to file any further documents during the pendency of the stay." The Court stated that it would lift the stay once matters in the Rausini Rule 35 proceedings were resolved.

---

[8] Rausini filed a declaration in support of this motion. In that declaration, Rausini alleged that when he met with Mueller and Burroughs in October 2000, Mueller and Burroughs were investigating allegations that various law enforcement officers connected to the criminal case were corrupt, that Rausini told them that he and Nason had been set up for both the Estes and Ellenberger murders by those corrupt law enforcement agents and individuals working with them, and that Nason had "unintentionally" killed Ellenberger in a physical altercation. *See* Dkt. No. 1684 (Rausini Decl. in Support of Nason's Motion for Relief).

During the 2011 evidentiary hearings in connection with Rausini's Rule 35 litigation, Judge Patel heard testimony from both Burroughs and Mueller. Both men testified that Rausini never denied his or Nason's involvement in the Estes and Ellenberger murders; that to the contrary, Rausini substantially implicated himself and Nason in both murders; and that Rausini never said that Nason killed Ellenberger in a physical altercation. *See* Dkt. No. 1785 at 48-52 (Mueller's testimony); Dkt. No. 1801 at 24, 30-34, 38-39 (Burroughs' testimony). Mueller also testified that he could not remember if they discussed any allegations of corruption at the October meetings, that if they did so it would be reflected in the FBI 302 report, and that if in the course of investigating and prosecuting the case there was any evidence of corruption, Mueller would have started a separate investigation, which he did not. *See* Dkt. No. 1785 at 89-92. Burroughs testified that when he and Mueller met with Rausini in October 2000, they were not investigating any kind of corruption or misconduct. *See* Dkt. 1801 at 24.

In connection with the 2011 Rule 35 proceedings, Burroughs also produced his handwritten notes of the October 2000 interviews with Rausini. Dkt. No. 1808-2. Those notes contain the information set forth *supra* that Rausini provided about the Ellenberger murder, and also state "no agreemt as to John being killed as of the [illegible]." *Id.* at NOTES0046. Nason contends that the notes are new evidence that support his claims. The Court addresses this contention *infra*.

9

**IV.     The current 28 U.S.C. § 2255 motion**

On March 10, 2015, Nason, now represented by counsel, filed a motion to lift the stay and to file an amended 28 U.S.C. § 2255 petition. Dkt. No. 1909. The motion asserted that that although Rausini's Rule 35 proceedings had not yet been fully resolved, all of the evidence relevant to Nason had been elicited from those proceedings and there was no need for a further stay. The government filed a response stating it did not oppose lifting the stay, "although it believes that Petitioner has more than exhausted his post-convictions claims." Dkt. No. 1913 at 1. On April 8, 2015, this Court lifted the stay. Dkt. No. 1914. In that order, the Court stated that Nason may file an amended § 2255 motion, although it expressed "no view at this time regarding the timeliness or merits of petitioner's claims."

On July 31, 2015, Nason filed an Amended Motion to Vacate Judgment and Sentence under 28 U.S.C. § 2255. Dkt. No. 1917. The Amended Motion does not state that it has been certified by the Ninth Circuit under 28 U.S.C. § 2255(h).[9] Nason's amended motion asserts two claims. Nason summarizes claim one as follows:

> The government tricked Nason into pleading guilty to the intentional killing of John Ellenberger. As a result, Nason's plea to that count was not voluntary or intelligent and must be set aside. The government tricked Nason by falsely representing that co-defendant Pierre Rausini would testify that he directed Nason to kill Ellenberger and that Nason followed Rausini's directions. In fact, the government knew that Rausini would not have given any such testimony. Instead, Rausini would have testified that he did not direct Nason to kill Ellenberger, that there was no agreement to kill Ellenberger, and that he (Rausini) has nothing to do with killing Ellenberger. But for the government's misrepresentation of Rausini's testimony against him, Nason would not have plead guilty to intentionally killing Ellenberger.

Dkt. No. 1917 at 2-3. Nason summarizes claim two as follows:

> Alternatively, should the government claim that it did not misrepresent Rausini's testimony, Nason contends that his attorney, Stuart Hanlon, provided ineffective assistance. Hanlon told Nason to plead guilty and accept the government's offer of a sentence of 25-years because he believed that Rausini's testimony would destroy Nason's defense, Nason would be found guilty at trial, and would be sentenced to

---

[9] 28 U.S.C. § 2255(h) provides, "A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain – (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

> life. If the government accurately described Rausini's testimony, Hanlon's advice was completely erroneous because Rausini's testimony would have supported Nason's defense.

*Id*. at 3.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2255, the federal sentencing court is authorized to grant habeas relief if it concludes that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." If the court finds that relief is warranted under § 2255, it must "vacate and set the judgment aside" and then do one of four things: "discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *United States v. Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999) (quoting 28 U.S.C. § 2255).

## DISCUSSION

### I. The amended petition is a second or successive petition

The government contends that Nason's second 2255 motion filed on January 5, 2009, and his amended motion filed on July 31, 2015, are "second or successive motions" under Section 2255, and thus that Nason was required to obtain permission from the Ninth Circuit before filing.

The Court agrees. As set forth *supra*, on June 22, 2004, Nason filed a motion under 28 U.S.C. § 2255, and on August 22, 2005, this Court denied the motion as untimely. Section 2255 "narrowly restricts an applicant's ability to file a second or successive motion." *Dodd v. United States*, 545 U.S. 353, 359 (2005); *Hernandez v. Campbell*, 204 F.3d 861, 864 (9th Cir. 2000) (Section 2255 bars a federal prisoner from filing a second or successive section 2255 petition "except in very narrow circumstances and only after receiving authorization to file from the court of appeals"). This rule applies when the previous petition was dismissed as barred by the statute of limitations, which constitutes a disposition on the merits. *McNabb v. Yates*, 576 F.3d 1028, 1029-30 (9th Cir. 2009).

This Court previously informed Nason that if he wished to file a second 2255 motion, he needed to first obtain permission from the Ninth Circuit. Dkt. No. 1484; *see also* 28 U.S.C. § 2244(b)(3)(A). Nason's amended motion does not state that he received permission from the Ninth Circuit to file a second or successive motion. Instead, Nason argues that his amended 2255 motion is proper because the government did not oppose his request to lift the stay and to file an amended petition, and the Court granted it. However, the government's response to the motion to lift the stay expressly stated that the government believed Nason had already exhausted his post-conviction relief, and the Court's order lifting the stay stated that the Court expressed no view on the merits or timeliness of Nason's claims.

Nason also argues that because all of his previous filings were *in pro per*, the Court should construe them liberally. Nason asserts that "the Court could construe Nason's Amended Motion as a motion to amend the *pro se* pleadings filed by Nason before the Court issued its stay in 2009, which the Court denied without prejudice subject "'to renewal.'" However, even if the Court construed the amended motion as a motion to amend the *pro se* filings from 2008 and 2009, that does not alter the fact that Nason filed an initial section 2255 motion in 2004, which this Court denied in August 2005. The Ninth Circuit has held that when a *pro se* petitioner files a new petition while his first petition remains pending, a district court is required to construe the new petition as a motion to amend the first petition. *See Woods v. Carey*, 525 F.3d 886, 888-90 (9th Cir. 2008); *see also Goodrum v. Busby*, __ F.3d __, 2016 WL 3201489, at *5 (9th Cir. June 9, 2016) (applying *Woods* to filings in court of appeals). However, Nason does not cite any authority for the proposition that this Court can disregard the fact that Nason has already filed a section 2255 motion that has been adjudicated on the merits.

Accordingly, the Court concludes that the current motion is a second or successive motion, and the Court DISMISSES the motion. *See United States v. Washington*, 653 F.3d 1057, 1063 (9th Cir. 2011) (dismissing uncertified second or successive section 2255 motion for lack of jurisdiction).

12

## II. Merits

In the alternative, the Court concludes that even if Nason's amended motion was properly before this Court, his claims fail.

### A. Claim One

Nason contends that his decision to plead guilty to the intentional murder of Ellenberger charged in Count Two was the direct result of the government's misrepresentations about Rausini's testimony. Nason contends that "but for the government's repeated assertion that Rausini would testify at Nason's trial and the government's affirmative misrepresentation of the nature of Rausini's testimony, Nason would not have pled guilty to the intentional murder of Ellenberger." Dkt. 1917 at 20.

"In order to be valid, a guilty plea must be 'voluntary and intelligent.'" *United States v. Hernandez*, 203 F.3d 614, 618 (9th Cir. 2000), *overruled on other grounds by Indiana v. Edwards*, 554 U.S. 164 (2008). "A plea is 'involuntary' if it is the product of threats, improper promises, or other forms of wrongful coercion, and is 'unintelligent' if the defendant is without the information necessary to assess intelligently 'the advantages and disadvantages of a trial as compared to those attending a plea of guilty." *Hernandez*, 203 F.3d at 619 (internal citations omitted) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)).

In *Brady v. United States*, 397 U.S. 742 (1970), the Supreme Court set forth the standard for determining whether a defendant's guilty plea is voluntary:

> [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Id*. at 755 (citation and internal quotation marks omitted). "A defendant who was warned of the usual consequences of pleading guilty and the range of potential punishment for the offense before entering a guilty plea must make two showings in order to set that plea aside as involuntary. First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his

plea." *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006) (citing *Brady*, 397 U.S. at 755). "Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." *Id*.

The Court finds that Nason has not demonstrated "egregiously impermissible conduct" by the government. Nason asserts that the government misrepresented to the defense that Rausini would testify at Nason's trial that he directed Nason to kill Ellenberger, when "[t]he truth, however, was that Rausini would have testified, if at all, that he did not direct Nason to kill Ellenberger. In fact, Rausini would have testified that he had nothing to do with Ellenberger's death." Dkt. No. 1917 at 27. However, Nason is speculating about what Rausini's testimony would have been if he had testified at the trial, and Nason acknowledges that "there is no document which states that Rausini would repudiate his plea agreement in his testimony at Nason's trial." Dkt. No. 1925 at 8. Rausini had plead guilty to soliciting Ellenberger's murder, and he had entered into the November 8, 2000 agreement with the government in which he agreed to assist the government and "testify truthfully and completely before any Grand Jury and at any hearing or trial" in exchange for the government's agreement to file a Rule 35 motion. Dkt. No. 1808-2. Mueller testified before Judge Patel that based on the October 2000 interviews with Rausini, he believed that Rausini had the potential to be a witness against Nason and Harrison, and that nothing Rausini said to him made Mueller doubt Rausini's guilt to any of the crimes to which he had plead guilty. Dkt. No. 1785 at 50-51.

Nason argues that Burroughs' handwritten notes of the October 2000 interviews show that Rausini would have repudiated his plea agreement because those notes state, *inter alia*, "no agreemt as to John being killed as of the [illegible]." Dkt. No. 1808-2 at NOTES0046. However, those notes show – consistent with the FBI 302 report and Burroughs' and Mueller's testimony about the October 2000 interviews – that Rausini never denied being involved in Ellenberger's murder, and to the contrary, Rausini substantially implicated himself and Nason in that crime.[10]

---

[10] The Court also rejects Nason's contention that Burroughs' notes are new evidence that renders the amended 2255 motion timely. Setting aside the fact that the amended petition is an uncertified second or successive motion, the Burroughs' notes do not provide new information because Nason has claimed since 2004 that Rausini denied soliciting Ellenberger's murder. Thus,

Further, Burroughs and Mueller both testified that to the extent Rausini attempted to downplay his role, he did so by shifting the blame to Nason by saying that Ellenberger's murder was Nason's idea. *See* Dkt. No. 1785 at 49-51; Dkt. No. 1801 at 38-39.[11]

The Court finds that on this record, there is no evidence that the government made any intentional misrepresentations to Nason or Hanlon regarding Rausini's willingness to testify at trial or the content of Rausini's testimony. In contrast, in the "highly uncommon" circumstances when courts have set aside guilty pleas as involuntary, defendants have shown that the government engaged in gross intentional misconduct that "strikes at the integrity of the prosecution as a whole." *United States v. Fisher*, 711 F.3d 460, 466 (4th Cir. 2013) (setting aside guilty plea where "the evidence the prosecution presented to Defendant and his counsel during deliberations as to whether Defendant should plead guilty was obtained under a search warrant issued solely on the basis of an untruthful law enforcement affidavit."); *Ferrara*, 456 F.3d at 291-93 (setting aside plea where prosecutors knew lead prosecution witness recanted story that defendant killed victim, prosecutors manipulated witness into reverting back to original story, prosecutors failed to disclose exculpatory government memo describing recantation and the suppressed evidence "was suggestive of the petitioner's factual innocence," and prosecutors made affirmative misrepresentations to defendant).

### B. Claim Two

Alternatively, Nason claims ineffective assistance of counsel. Nason asserts, "[s]hould the government now argue it accurately represented to Nason (1) that Rausini was going to testify against him and (2) that the substance of Rausini's expected testimony was that Rausini did not order Nason to kill Ellenberger, then Nason alternately contends that his attorney, Stuart Hanlon, provided ineffective assistance in violation of Nason's Sixth Amendment right to counsel." Dkt.

---

the amended petition is also untimely.

[11] Burroughs also testified that the information Rausini provided about the Ellenberger murder was corroborated, that there were other cooperating defendants who had agreed to testify at trial against Nason, and that there was forensic evidence and other witnesses (such as girlfriends) who were prepared to testify. *See* Dkt. No. 1801 at 19-20, 37-38, 71-72, and 117.

No. 1917 at 28. "Under these facts, Hanlon was ineffective because Rausini's testimony, that he did not order Nason to kill Ellenberger and had nothing to do with Ellenberger's death, would have actually supported Nason's defense and, alternatively, Rausini's testimony would have been so severely impeached that his testimony against Nason would have been worthless." *Id*.

To succeed on an ineffective assistance of counsel claim, petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires him to show deficient performance and prejudice. Deficient performance requires a showing that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). To establish prejudice, petitioner must demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Judicial scrutiny of counsel's performance must be highly deferential, and a court must apply a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 669. Reasonableness is assessed, not based on what defense counsel could have done, but rather on whether the choices that defense counsel made were reasonable in light of all attendant circumstances. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

The Court finds that Nason's alternative claim lacks merit. Nason's claim is premised upon the government advancing particular arguments that it has not, in fact, advanced. The government does not assert that the prosecution told Hanlon that Rausini intended to testify that he did not order Nason to kill Ellenberger. In any event, based upon the record before the Court, Nason has not shown that Hanlon's representation fell below an objective standard of reasonableness with regard to advising Nason to plead guilty. The record shows that Rausini had plead guilty to directing Nason to kill Ellenberger, that Rausini had agreed to "testify truthfully and completely before any Grand Jury and at any hearing or trial," and the government had provided Hanlon with the FBI 302 report in which Rausini described the circumstances surrounding the Ellenberger murder in detail and stated that Nason killed Ellenberger. Under these circumstances, it was objectively reasonable for Hanlon to advise Nason to plead guilty.

Because Nason fails to show deficient representation, the Court need not address the second prong of the *Strickland* test. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998) (holding that it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner cannot establish incompetence under the first prong.).[12]

## CONCLUSION

For the reasons set forth above, the Court DISMISSES this motion as an uncertified second or successive motion under 28 U.S.C. § 2255. In the alternative, the Court DENIES the motion as untimely and finds that the claims lack merit. The Court DENIES a certificate of appealability, finding that this is not a case in which reasonable jurists would find this Court's assessment of the constitutional claims debatable or wrong.

**IT IS SO ORDERED**.

Dated: July 21, 2016

SUSAN ILLSTON
United States District Judge

---

[12] In light of the Court's disposition of the parties' contentions, the Court finds it unnecessary to address the parties' arguments regarding waiver.